# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **COREY SMITH,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:14cv00168 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **Lt. J. ELY, et al.,** | ) | By: PAMELA MEADE SARGENT |
| Defendants. | ) | United States Magistrate Judge |

The pro se plaintiff, Corey Smith, ("Smith"), an inmate currently incarcerated at Red Onion State Prison, ("Red Onion"), brings this civil rights action under 42 U.S.C. § 1983, against various former and current employees at Red Onion and Wallens Ridge State Prison, ("Wallens Ridge"), where he formerly was housed, based upon allegations that he was beaten by corrections officers while awaiting transport from Wallens Ridge to Red Onion, repeatedly shocked by a stun belt and denied appropriate medical care for his injuries. Smith's claims are before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). An evidentiary hearing/bench trial was held before the undersigned on August 12-13, 2015. The undersigned now submits the following report recommending that judgment be entered in favor of the defendants.

## I. Facts

At trial, Smith testified that he was physically assaulted, without provocation, by three corrections officers while awaiting transport from Wallens Ridge to Red Onion on July 18, 2012. According to Smith, the defendant

correctional officers were upset because Smith had participated in a disturbance at Wallens Ridge the previous evening. Smith conceded that he was among numerous Wallens Ridge inmates who refused to return to their cells as ordered after being told that they were not going to receive recreation that day. All parties concede that no one was injured in the July 17, 2012, disturbance, and no property was damaged. The inmates, including Smith, eventually returned to their cells as ordered.

As a result of this disturbance, Smith and other Wallens Ridge inmates were transferred to Red Onion and placed in segregation. Smith, at one point, testified that, before he was placed on the transport van at Wallens Ridge on July 18, 2012, Sgt. Fannon punched him six to eight times in the right side of his face, smashed the left side of his face into the side of the transportation van at least three times and choked him. During this time, Smith testified that he was restrained in handcuffs and leg irons, and Officer Carico held his hands. He said that Lt. Ely held him by his shirt. Smith testified that when he was placed on the van, he had blood coming out of his nose and out of his busted lip. He stated that there was so much blood that it dripped onto his shirt. At another point in his testimony, however, Smith stated that he already was seated on the van when Fannon "snatched" him off of the van and took him around behind the van and started assaulting him. Smith testified that, during the assault, Ely told Fannon to be careful because people were watching. Smith said that Fannon replied, "I don't give a damn."

Smith testified that Ely then instructed Fannon to put an electric shock belt on Smith. Then, according to Smith, Ely said, "It is my time to have fun with this nigger now." After being placed in the belt, Smith said, Fannon "threw" him on the van, and Fannon and Ely took turns shocking him multiple times with the belt. He also testified that Fannon used his left hand to activate the shock belt while he used his right hand to spray OC pepper spray on Smith and inmate Donta Clanton. Smith said that he was shocked at least 10 times with the belt and that he yelled out in pain each time. Smith testified that he was shocked so many times that he almost passed out on the transport to Red Onion. Smith testified that this assault occurred in the presence of two other corrections officers, defendants Combs and Fields, who failed to intervene. Smith testified that, before the van left Wallens Ridge, Combs opened the door of the van. When he did so, Smith said he complained to Combs about being shocked. Smith testified that Combs said, "You niggers are going to learn." Smith said he told Combs that he could not see out of his eyes due to being sprayed by the OC pepper spray. He testified that Combs replied, "Good."

Smith testified that, about 10 minutes after he was placed on the van, another inmate, Willie Smith, was placed on the van. Smith testified that Ely was spraying Willie Smith with OC pepper spray as he was getting on the van. Smith also testified that Clanton already was on the van when he was placed on the van. Smith stated that Clanton was wearing a electric shock belt and that he had bruising and swelling to his face as if he had been beaten also.

Smith also testified that he did not receive any medical attention and was not decontaminated as required after being subjected to the use of OC pepper spray, before leaving Wallens Ridge. He further testified that, upon arrival at Red Onion,

-3-

a spit mask was placed over his head by officers before he disembarked the transport van so that his "busted face, lips, nose and swollen black eyes" could not be seen on the handheld video camera recording. Smith testified that he was taken to the medical department, where he saw Nurse Glenda Tate. Smith testified that he told Tate that he could not see out of his eyes due to the OC pepper spray and that he had been beaten and shocked with the electric shock belt. When he requested something for his back, Smith claimed that Tate stated "You will live boy, welcome to Red Onion." Although she looked at his back wound, Smith testified that Tate refused to dress it or give him any medication. Smith alleges that Tate forged his medical files, stating that he had no open areas or redness in order to help cover up for the corrections officers' actions.

Smith specifically denied that, once placed on the transport van at Wallens Ridge, he began kicking the interior cage doors inside the van. In fact, Smith claimed that he did "nothing" once on the van to justify any use of force by any officer. Smith did concede that he was charged with destruction of state property for his actions on the van. Furthermore, he admitted that he accepted a penalty offer on this disciplinary charge – admitting that he had engaged in the conduct charged.

Smith testified that Red Onion Counselor Baker had asked him what had happened to his face. Smith said he told Baker about being assaulted and shocked. Smith testified that, immediately after being placed in his cell at Red Onion on July 18, 2012, he looked in a mirror and saw a "laceration" on his back on the left side near his spine. Smith stated that this laceration was approximately the size of the tip of his "pinky" finger or a pencil eraser and was oozing either pus or blood or

-4-

both. Smith said that use of the belt also had burned a hole in his clothing. Smith testified that this wound did not get infected and eventually healed, leaving a "painful keloid scar," which, he claims, was documented in an October 23, 2012, nursing note.

Smith introduced into evidence a video recording taken upon his arrival at Red Onion. This video clearly shows the left side of Smith's face, prior to the guard placing a spit mask on his head upon his arrival at Red Onion. There were no visible signs of injury to Smith's face or head. There also were no signs of blood on his face or clothing. This video also shows that Smith was on a transport van with Willie Smith and Clanton, and that each of them was wearing an electric shock belt upon their arrival at Red Onion.

Both Willie Smith and Clanton testified. Willie Smith testified by video conference from Sussex I State Prison. Willie Smith admitted that he was one of the inmates transferred from Wallens Ridge to Red Onion on July 18, 2012. He testified that, when he was placed on the transport van, there was another inmate in another compartment on the van. He said, however, that he could not tell who it was. Willie Smith testified that prior to his transport, he was placed in a "jacket" or a "vest" that he described as resembling a bulletproof vest. He said that he had never seen one of these vest before and never has seen one since. Willie Smith stated that, after he was placed on the van, the vest was used to shock him three times. He said that each of these shocks lasted 10 to 15 seconds. Willie Smith testified that he suffered no lasting injury from the use of the vest to shock him.

Willie Smith stated that he did not recall any of the officers saying anything and that he did not know who shocked him or why he was shocked. In particular, he stated that no officer gave him any order before shocking him. He specifically denied doing anything to justify the officer using force on him. He also specifically denied lying down on the floor of the van and sticking his legs out so that the officers could not close the van door. Willie Smith also specifically denied that OC pepper spray was used by the officers on him or anyone in the van. He testified that he did not see any evidence that the other inmate on the van was shocked, physically assaulted or sprayed with OC pepper spray. Willie Smith stated that he was not seen by a nurse upon his arrival at Red Onion.

Clanton testified that he, too, was transferred from Wallens Ridge to Red Onion on July 18, 2012. Clanton specifically denied that he suffered any physical assault by officers on that date. He also denied that he was shocked or that OC pepper spray was used on him. Clanton testified that he was the first inmate placed on the van that day. Clanton also testified that he did not witness any inmate beaten, shocked or subjected to the use of OC pepper spray on July 18, 2012. Clanton stated that he was seen by a nurse upon his arrival at Red Onion. The nurse checked his weight and temperature.

Smith also called inmate Emmitt George Roscoe, Jr. to the stand, but Roscoe refused to offer any testimony or answer any questions.

Smith claims that on July 25, 2012, he stopped former Counselor Honeycutt during her rounds in his pod at Red Onion to report the assault. She observed his face, which remained partially swollen and bruised, and his eyes still black. Smith

-6-

informed her that he was having "extreme back pain" from being shocked with the electric shock belt and that he had a "third degree burnt laceration" that needed to be treated in order to avoid infection. Smith said he raised his shirt and showed the wound to her. Smith advised Honeycutt of Nurse Tate's refusal to treat him during his intake visit on July 18, 2012.

Smith testified that he saw Dr. Miller on July 26, 2015, with Nurse Tate present. He informed Dr. Miller of the physical assault by the corrections officers, including the use of the electric shock belt, that he never received any medical treatment and that he needed something for pain. Smith testified that when Dr. Miller asked to take a look at the wound, Nurse Tate interfered with the exam and told Dr. Miller that Smith could sign up for sick call. Smith said that he protested to Dr. Miller that he had not received any medical treatment for his injuries. Nonetheless, Dr. Miller informed Smith that, since he did not appear to be in any pain at that time, he could sign up for sick call, and he sent him back to his cell. Smith claims this was done so that the physical assault and resulting injuries would never be documented.

Smith testified that, on August 7, 2012, defendant Randall C. Mathena, the former Warden at Red Onion, was making rounds in Smith's housing pod, when he informed Mathena of the physical assault by the three corrections officers and his injuries. Smith testified that Mathena told him that he had heard about the assault and that it was being investigated. Smith also said that Mathena promised to provide Smith with medical treatment for his injuries, but he did not.

Smith testified that on October 23, 2012, he filed an Emergency Grievance regarding the assault and his injuries. Smith further testified that in December, Internal Affairs Investigator White came and spoke to him about the July 18, 2012, assault. Smith stated that he did not recall receiving orientation on the Virginia Department of Corrections, ("VDOC"), inmate grievance procedures when he arrived at either Nottoway Correctional Center or Wallens Ridge. He testified that he was not oriented on the inmate grievance procedures when he arrived at Red Onion. Smith testified that he was unable to exhaust his administrative remedies before filing this suit because "every person [at Red Onion] who he asked for a form, refused to give him one." Smith conceded, however, that he has filed other informal complaints and grievance forms while at Red Onion.

Trisha M. Cox, a licensed practical nurse at Red Onion, also testified. Cox stated that she does not recall which prison building that she worked in at the time of Smith's transfer to Red Onion. Cox testified that, if she had seen Smith or any other inmate come into Red Onion injured, she would have assessed the injury and documented it. She stated that nurses make two pill passes a day in each building at Red Onion. She also stated that, usually, the same nurse who conducts pill pass in a building also would conduct sick call in the building on the weekdays. Cox stated that, if an inmate wanted to see a nurse, all the inmate had to do was obtain a sick call request from a security officer and fill it out and submit it. Cox also viewed the video recording of Smith's arrival at Red Onion, and she testified that it showed no visible signs of injury to his face or left eye.

Emily Adams, another licensed practical nurse who worked at Red Onion on July 18, 2012, also testified. Adams testified that she examined Smith and other

inmates arriving from Red Onion on July 18 for any type of injury or illness. In particular, Adams stated that she checked Smith's back for signs of injury because she had been informed that the electric shock belt had been used on him. Adams stated that the documentation she completed that day, Defendants' Exhibit No. 1, shows that she observed no injury to Smith's back. Adams stated that, if there had been any sign of injury, she would have documented it. She also stated that, if Smith had voiced complaints, she would have noted them.

Terrance Huff, a Mental Health Supervisor at Red Onion, also stated that he spoke with the plaintiff at Red Onion on July 18, 2012. Huff testified that his documentation, Defendants' Exhibit No. 2, showed that he spoke with Smith at 2:46 p.m. on July 18 at his segregation cell, cell B-209. His report stated that Smith "appear[ed] healthy with no visible injuries." Huff stated that, if Smith's face had been swollen and bleeding, he would have documented it. He also stated that he would have documented it if Smith had complained to him of any injury. Huff stated that he spoke with Smith again on August 14, 2012. On this occasion, he stated that Smith, again, had no visible injuries, and he did not complain of any injuries.

Lieutenant Mullins, a Building Lieutenant at Red Onion in 2012, also testified. Mullins stated that he could not remember Smith in particular, but he did remember the inmates being transferred from Wallens Ridge to Red Onion on July 18, 2012. Mullins said that none of the arriving inmates had any visible signs of injury. He stated that, if any of the inmates had arrived with injuries, the correctional officers at Red Onion would have taken photographs of the injuries. Mullins also testified that the logbook for the B4 pod at Red Onion where Smith

Case 7:14-cv-00168-GEC-PMS   Document 131   Filed 11/03/15   Page 9 of 27   Pageid#: 840

was housed in segregation contained no entry of Warden Mathena coming into the pod on August 7, 2012. Mullins also testified that he would have given Smith grievance forms if he had asked for them.

Captain James Brown testified that he was the Watch Commander at Wallens Ridge on July 17, 2012. Brown stated that, after the inmates returned to their cells on the evening of July 17, he made rounds through the pod. Brown testified that the refusal of the 40 or so top tier inmates to return to their cells when ordered to do so on July 17 was a "major incident," requiring notification up the chain of command to the VDOC Regional Operations Chief. Brown stated that, as a result of statements Smith made to him admitting his role, he considered Smith a "major player" in the July 17 disturbance. Brown testified that Smith admitted to him that he had shouted "we don't have to go into these cells" during the disturbance. Brown conceded that no one was injured and no property damaged during the disturbance.

Major John Combs testified that he worked at Wallens Ridge on July 17 and 18, 2012. Combs stated that he was at home and reported to work on July 17 when he was notified that 40 inmates were ignoring officers' orders to return to their cells. Combs stated that he was the person who made the decision to transfer Smith and other inmates to Red Onion after the disturbance. Combs stated that he was present at Wallens Ridge on July 18 as Smith and the other inmates were being loaded into vehicles for transport to Red Onion. Combs stated that he went outside to where the vehicles were being loaded when it was reported that the officers had used force in the form of OC pepper spray on Willie Smith. When he arrived outside, Combs testified that none of the inmates looked as if they had been

-10-

assaulted. Combs specifically denied ever instructing anyone to shock Smith or any other inmate on July 18.

Jennifer Beth Messer, the Grievance Coordinator at Red Onion, testified regarding the requirements of VDOC Operating Procedure 866.1, which was in effect in 2012. (Defendants' Exhibit No. 10.) Messer testified that, under the terms of this policy, to exhaust administrative remedies, an inmate was required to first file an Informal Complaint form, Defendants' Exhibit No. 11. Messer testified that these forms were available upon request from any security officer. Once an Informal Complaint form was submitted, it would be logged into the CORIS recordkeeping system, a receipt would be issued to the inmate, and the form would be forwarded to the proper staff member to respond. Messer said the policy required the staff's response to be made to the inmate within 15 days. The staff member's response would be written on the original Informal Complaint form and returned to the inmate. If the inmate was dissatisfied with the response, or if no response to the Informal Complaint was received within 15 days, the inmate could then file a Regular Grievance, Defendants' Exhibit No. 12.

Messer testified that the policy required an inmate to file a Regular Grievance within 30 days of the occurrence of which he complains. She stated that these forms, like the Informal Complaint forms, were available from the prison's security officers. When a Regular Grievance form is submitted, it is reviewed to determine if it will be accepted or rejected. If rejected at intake, Messer said, the original Regular Grievance form is returned to the inmate with the reason for the rejection listed on the form. The inmate, then, may appeal the intake decision to the

VDOC Regional Ombudsman within five days. Copies of all Grievances rejected at intake are maintained in an offender's file

When a Regular Grievance is accepted, Messer said, a receipt is issued to the inmate, the Grievance is logged into the CORIS system, and it is then routed to the appropriate department to respond. The original Regular Grievance form is returned to the inmate with the department's response. If an inmate is dissatisfied with the response to a Regular Grievance, he may appeal within five days to Level II to the Regional Administrator. Messer stated that the decision on the Level II appeal is final with some rare exceptions, such as a decision regarding publications available for inmates.

Messer also testified that the policy required an inmate to file his Informal Complaint and Regular Grievance forms with the institution where the event occurred about which the inmate complained. If, after the event, the inmate had been transferred, he would have to mail the forms to the correct institution. Messer testified that Smith had filed an Informal Complaint with Red Onion on August 7, 2012, complaining that he was assaulted by Fannon on July 18, 2012, at Wallens Ridge, Defendants' Exhibit No. 13. This Informal Complaint was returned to Smith with instructions to file the Informal Complaint with Wallens Ridge.

On September 14, 2012, Smith filed another Informal Complaint with Red Onion, complaining that he had not received a response to his August 7, 2012, Informal Complaint, Defendants' Exhibit 14. This Informal Complaint was returned to Smith with instructions to attach the receipt for the first Informal Complaint to go forward. On September 25, 2012, Smith filed a Regular Grievance

-12-

with Red Onion concerning the alleged events of July 18, 2012. Messer testified that this Regular Grievance was rejected at intake because it involved an incident at another institution. Messer said that her records showed that Smith did not appeal this decision.

Messer testified that Smith filed another Informal Complaint on October 25, 2012, claiming that he did not receive proper medical attention on July 18, 2012, Defendants' Exhibit No. 16. The medical department responded that Smith had been checked by nursing staff on that day after the use of the electric shock belt on him. Messer said that this Informal Complaint did not allege that Warden Mathena had not provided the proper medical care. Furthermore, Messer stated, Smith did not file a Regular Grievance regarding his allegations that he had not been provided with proper medical care from the nursing staff or Warden Mathena. Messer testified that Smith filed a total of eight Informal Complaints at Red Onion from July 2012 to December 2012.

Brenda Joyce Ravizee, the Institutional Ombudsman at Wallens Ridge, also testified. According to Ravizee, all VDOC inmates receive orientation in the VDOC's grievance procedure every time they are received at a new VDOC facility. In fact, Ravizee testified that Smith's institutional file shows that he acknowledged receipt of an orientation packet, which included information on the grievance procedure, when he arrived at Wallens Ridge on September 13, 2010. (Defendants' Exhibit No. 18). Ravizee also testified that, on December 5, 2012, Smith filed an Informal Complaint with Wallens Ridge, complaining that Fannon used force on him July 18, 2012. (Defendants' Exhibit No. 19). On December 20, 2012, Ely responded, telling Smith that Fannon denied the allegations. Ravizee

testified that the original Informal Complaint form with the response was returned to Smith with a copy retained in his file.

Ravizee also stated that Smith's file contains a Regular Grievance form that Smith filed with Wallens Ridge on January 9, 2013. (Defendants' Exhibit No. 20). On this Regular Grievance form, Smith complained that the Grievance Department had violated his rights because he had not received a response to his December 20, 2012, Informal Complaint alleging an assault by Fannon on July 18, 2012. This Regular Grievance was rejected on intake because Smith had not attached his Informal Complaint, Ravizee said. Smith appealed this decision, and the Regional Ombudsman upheld the decision and also found that the Regular Grievance was not timely filed.

Ravizee also testified that Smith sent a Regular Grievance form directly to the Regional Ombudsman's office in Roanoke on January 28, 2013, seeking to appeal his "level 2 response." (Defendants' Exhibit No. 22.) On this form, Smith stated that he did not receive a response to his December 20, 2012, Informal Complaint until January 9, 2013, thus violating his "rights." Smith also complains that his Regular Grievance was rejected as untimely filed despite the fact that he "tried to resolve this issue several times before."

Based on her review of Smith's institutional file, Ravizee stated that Smith had not properly exhausted his administrative remedies regarding his claim that he was assaulted at Wallens Ridge on July 18, 2012.

Vicky Phipps, the Director of Nursing at Red Onion, testified that she had reviewed Smith's VDOC medical records from May 2012 through June 2013. Phipps testified that Smith's records included a July 18, 2012, nursing assessment note, stating that Smith's back was checked because the electric shock belt had been used on him in transport. Phipps stated that the entry noted no complaint by inmate, no redness and no broken skin. Phipps stated that, if Smith had complained of injury, it should have been noted, and, if there was a visible sign of injury, it should have been documented. Phipps also stated that the records contained a July 26, 2012, note by Dr. Miller documenting an intake medical exam. Phipps testified that Dr. Miller's note of this day makes no mention of Smith complaining of any injury to his back. Dr. Miller did note that Smith complained of back pain and could sign up for sick call for this complaint.

Phipps testified that a nurse passes through the segregation unit at Red Onion at least twice a day to do morning and evening "pill pass" to distribute medication. Phipps also stated that a nurse makes rounds and visually checks on each inmate housed in segregation at Red Onion each day. She stated that Red Onion maintains a sheet on the cell door of each inmate housed in segregation, and a nurse signs these sheets every day, indicating when she checked on each inmate.

John Robbins testified that he was the Armory Officer at Wallens Ridge on July 18, 2012. Robbins said that he was assigned to drive one of the vans transporting inmates from Wallens Ridge to Red Onion on July 18. Robbins said that he recalled escorting a couple of inmates from a prison building to a van, but he did not recall the identities of these inmates. Robbins said that, after he came outside to assist with transport, he heard inmates kicking the inside of the van that

he eventually drove to Red Onion. Robbins stated that he did not see any officers assault anyone. Robbins also stated that, while he did not remember the names of the inmates were who were on the van he drove, he could see the inmates in his rearview mirror, and he did not see any visible injuries on the inmates. No inmate complained to him of being assaulted, and no inmate complained of anyone repeatedly using the electric shock belt on him.

Defendant Tracy Fields testified that he was working as the Lieutenant of the B Building at Wallens Ridge on July 18, 2012. Fields stated that he strip searched Smith that morning, placed him in restraints and, along with Lt. Carico, escorted him to the transport van. Fields stated that Smith did not have an electric shock belt on as he walked to the van. Fields said that, when they arrived outside the building, they turned Smith over to Ely and then went back inside the building to escort other inmates out. Fields stated that Smith was not disruptive or combative as he walked to the van.

Defendant Jonathan Carico testified that he, too, worked as a Lieutenant at Wallens Ridge on July 18, 2012. Carico stated that he escorted Smith from the building to the van to be transported to Red Onion. Carico stated that he turned Smith over to Ely and, then, went into the B Building to escort other inmates. He did not recall seeing Smith again that day. Carico testified that he did not see anyone assault any inmate that day. He said that, if he had seen a correctional officer assault an inmate, he would have stopped the assault and reported it. Carico specifically denied holding Smith's hands while Fannon assaulted him. Carico stated that he did not shock Smith and that he did not see anyone shocked that day.

Defendant Joseph Ely testified that he was a Lieutenant and the day shift Watch Commander at Wallens Ridge on July 18, 2012. Ely stated that when he arrived at work that day he was told he would be assisting with the transport of a number of inmates to Red Onion. Ely stated that he placed Clanton, with an electric shock belt on, on the van first. Officers Fields and Carico then walked Smith to the van. Once Smith was placed on the van with Clanton, Ely stated that the inmates began yelling and kicking the inside of the van. Ely said that he ordered the inmates to stop kicking the inside of the van, and they stopped. Ely said he then removed Smith from the van and, assisted by Fannon, placed an electric shock belt around Smith's waist and returned him to the van.

Ely stated that he did not pull Smith off of the van, causing him to stumble. He testified that Smith got off of the van as instructed. Ely specifically denied that he held Smith or restrained him in any way while Fannon assaulted him. Ely testified that no one struck Smith, and no one slammed his face into the van. Ely stated that, after returning to the van, Smith, again, began kicking the interior van doors and hitting the walls of the compartment with his shoulder. Ely said that he gave the inmates two direct orders to stop, and they did not. He stated that he then shocked one inmate, and then the other. After that, the inmates complied with his order. Ely stated that he shocked Smith only one time, and that he did not give the belt control to Fannon. Ely testified that he used only that amount of force necessary to take control of the situation and protect property.

Ely stated that they next placed Willie Smith in the back of the van. Ely testified that when Willie Smith was getting on the van, he laid down on the floor of the van with his feet sticking out the back door so it could not be closed. When

-17-

Willie Smith refused Ely's order to move his legs, Ely said that he sprayed Willie Smith with OC pepper spray, and he complied. Ely testified that he then took Willie Smith off of the van and placed an electric shock belt on him and returned him to the van. According to Ely, Major Combs asked the inmates on the van if they wanted to be taken off of the van and decontaminated because of the use of the OC pepper spray, and none of the inmates stated that they wanted to be decontaminated.

Ely testified that, after Willie Smith was placed back on the van, he started kicking the interior of the van. Ely stated that he used the belt to shock Willie Smith, and he stopped kicking. Ely stated that Robbins drove the van with Smith, Clanton and Willie Smith to Red Onion, and he accompanied Robbins. Ely stated that none of the inmates on the van complained of any injury during the trip to Red Onion.

Defendant Mark Fannon testified that he worked as the Building Sergeant of D Building at Wallens Ridge on July 18, 2012. Fannon testified that he helped Ely place the electric shock belt on Smith. Fannon stated that he did not hit Smith, and he did not slam Smith's head into the van. He also stated that he did not shock Smith with the belt. In fact, Fannon stated that he never had possession of the control to Smith's shock belt. Fannon testified that he did not remember using OC pepper spray on anyone in the van on that day.

Fannon testified that he no longer works for VDOC. He stated that Plaintiff's Exhibit No. 3 was provided to him in discovery from VDOC as his report of the events of July 18, 2012. He stated, however, that he did not believe

that he drafted this report because he did not sign it and because he did not use any force on any inmate on July 18. He stated that he was not present when the belt was used to shock Smith. Fannon testified that he did not transport any inmates to Red Onion that day. When confronted with video footage showing him present at Red Onion as inmates got off of a VDOC bus, however, he conceded that he must have been there, but he did not remember being there that day.

Defendant Glenda Tate testified that she was working as a licensed practical nurse at Red Onion on July 18, 2012. Tate stated that she conducted a nursing intake assessment of Smith upon his arrival at Red Onion. Tate stated that Smith was in no acute distress. She stated that she checked his back because the electric shock belt had been used. She said that she saw no open area or redness on his back. Tate stated that, if Smith had complained of an injury, she would have documented it in her report. She stated that there was no laceration or burn area on Smith's back. Tate stated that, at the time she assessed Smith, he was no longer wearing the clothing he had been in when transported from Wallens Ridge. Tate stated that she had seen "signature marks" from the use of electric shock belts on other inmates on other occasions, but she had never seen an inmate who needed medical treatment based on the use of these belts. She stated that Smith did not have any signature marks on his back.

Tate testified that Smith did not have any signs of injury to his face. She said that he did not complain of any injury or of the use of OC pepper spray. Tate stated that she did not recall a spit mask being on Smith's face when she saw him, but if he had been in a spit mask, she still would have been able to see if his eyes were

black and swollen. She further testified that Smith did not complain of his eyes being black and swollen.

Tate stated that, while it was likely that she was present when Dr. Miller examined Smith on July 26, she did not remember being present. She testified that she did not yell at Dr. Miller or attempt to interfere with his examination of Smith in any way. Tate said that she did nothing to influence Dr. Miller's treatment of Smith or what he wrote about his treatment. She said that, as a nurse, she did not have the authority to tell a doctor how to conduct an examination. In fact, she stated that Dr. Miller, as the treating doctor, would tell her what to do. She testified that she had never falsified a medical note and had never witnessed Dr. Miller falsify a medical note. She further testified that she had never observed Smith needing any medical treatment.

Defendant Randall C. Mathena testified that he was the Warden of Red Onion on July 18, 2012. Mathena stated that he had no memories of ever speaking to Smith while he was an inmate at Red Onion. Mathena stated that, if any inmate had told him he had been injured, Mathena would have notified medical personnel, the officer in charge and the investigation unit. Mathena stated that, while he remembered the Wallens Ridge inmates being transferred to Red Onion as a result of the disturbance, he does not remember a conversation with any inmate, in which the inmate reported any injuries.

*II. Analysis*

Smith's Complaint states a number of claims against the defendants, including § 1983 claims for use of excessive force against defendants Ely, Fannon and Carico, for failure to intervene to prevent the use of excessive force against defendants Combs and Fields and for deliberate indifference to serious medical needs against defendants Tate and Mathena. Smith's Complaint also alleges state law claims for assault and battery against Ely, Fannon and Carico and negligence claims against Combs, Fields, Tate and Mathena. While the defendants have raised numerous legal defenses to these claims, the undersigned's decision on each of these claims turns on the credibility of the witnesses.

If the plaintiff's testimony is to be believed, the plaintiff endured a vicious beating for no cause by defendant Fannon, while the other correctional officer defendants either held him or stood by without intervening. If the plaintiff's testimony is to be believed, this beating resulted in obvious, serious injuries to the plaintiff's face, including two black, swollen eyes, swollen and bruised cheeks and a busted and bloody nose and mouth. If the plaintiff's testimony is to be believed, this beating was followed by repeated shocks from an electric shock belt so severe that they burned through two layers of plaintiff's clothing to create an open, oozing third-degree burn on plaintiff's back. If the plaintiff's testimony is to be believed, he arrived at Red Onion with obvious, visible signs of serious injury which were purposefully ignored by the medical and correctional staff. And, if the plaintiff's testimony is to be believed, he reported all of this to the Warden of Red Onion, who took no action whatsoever to further investigate or report his allegations. To believe the plaintiff's testimony, however, the court first must discredit the

Case 7:14-cv-00168-GEC-PMS    Document 131    Filed 11/03/15    Page 21 of 27    Pageid#: 852

testimony of each of the 19 other defendants and witnesses who testified to the contrary  and ignore the fact that the video evidence shows that the plaintiff arrived at Red Onion displaying no visible signs of injury. The court also would have to ignore the fact that the plaintiff, in essence, pleaded guilty and accepted a penalty offer for his disruptive behavior after being placed on the transport van that day.

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects prison inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian,* 503 U.S. 1, 5 (1992); *Whitley v. Albers,* 475 U.S. 312, 319 (1986). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994*); Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984).

The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component. *See Williams,* 77 F.3d at 761 (citing *Wilson v. Seiter,* 501 U.S. 294, 302 (1991)). Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson,* 503 U.S. at 9 (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)). To meet the objective component in an excessive force case, an inmate must show that the force used was "nontrivial," *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), given that "contemporary standards of decency always are

violated… whether or not significant injury is evident." *Hudson,* 503 U.S. at 9. "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Wilkins,* 559 U.S. at 37 (quoting *Hudson,* 503 U.S. at 7). In fact, the extent of the injury may suggest that "'the use of force could plausibly have been thought necessary' in a particular situation" or "provide some indication of the amount of force applied." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7). For example, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins,* 559 U.S. at 37 (quoting *Johnson,* 481 F.2d at 1033). As *Wilkins* clarified, it is the nature of the force "that ultimately counts" and provides the "core judicial inquiry" in an excessive force case. 559 U.S. at 37, 38. In particular, courts must consider "whether [the force] was nontrivial and 'was applied…maliciously and sadistically to cause harm.'" *Wilkins,* 559 U.S. at 39 (quoting *Hudson*, 503 U.S. at 7).

To meet the subjective component in an excessive force case, the inmate must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320-21. The inquiry under the subjective standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. The Supreme Court in *Whitley* set out several factors which should be considered in determining whether prison officials acted maliciously and sadistically. In particular, the court should consider:

1) The need for application of force,

2) The relationship between that need and the amount of force used,

3) The threat "reasonably perceived by the responsible officials," and

4) "any efforts made to temper the severity of a forceful response."

*Williams,* 77 F.3d at 762 (citing *Whitley,* 475 U.S. at 321).

Based on the evidence presented, I am persuaded that Smith was not beaten or otherwise injured on July 18, 2012. The defendants have admitted that Ely administered one shock to Smith by the use of an electric shock belt, and I so find. I further find that the shock administered to Smith in this case was "nontrivial," in that the use of such force in the absence of a reasonable justification would violate "contemporary standards of decency." *Wilkins*, 559 U.S. at 39; *Hudson,* 503 U.S. at 9. Nonetheless, I find that the force used by Ely against Smith was not excessive, in that it was applied in a good-faith effort to control Smith's actions in kicking and being disruptive inside the prisoner transport van. *See Hudson*, 503 U.S. at 7. I also find that Smith was not injured by the use of the electric shock belt.

Insofar as Smith claims that Ely's use of force against him amounted to an assault and battery, under Virginia law, "[a] legal justification for the act being complained of will defeat an assault or battery claim." *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009). Based on the finding above that the force used by Ely was justified to control Smith's actions, I find that no assault or battery occurred.

Insofar as Smith claims that Tate and Mathena were deliberately indifferent to his serious medical needs, I am persuaded that Smith did not suffer from any serious medical needs upon his presentation to Tate or Mathena. Smith also has failed to present evidence sufficient to prevail on his purported medical negligence

claim against Tate, in that I find that he did not suffer from any injury that needed treatment by Tate.

I also find the defendants have shown that Smith failed to exhaust his administrative remedies before filing suit. While Smith testified that no administrative remedies were available to him because he was unable to obtain the forms necessary, the evidence before the court shows that he has filed numerous Informal Complaints and Regular Grievance forms since arriving at Red Onion. Also, the uncontradicted evidence is that Smith filed an Informal Complaint regarding the incident, but he filed it at the wrong institution.

The Prison Litigation Reform Act, ("PLRA"), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, … until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a) (West 2012). "The exhaustion requirement is mandatory, and courts lack the authority to waive that requirement." *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. Feb. 18, 2011) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). Virginia Code § 8.01-243.2 states: "No person confined in a state or local correctional facility shall bring or have brought on his behalf any personal action relating to the conditions of his confinement until all available administrative remedies are exhausted." VA. CODE ANN. § 8.01-243.2 (2015).

## PROPOSED FINDINGS OF FACTS AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The only force used on Smith on July 18, 2012, was the use of the electric shock belt on him by Ely;

2. The force used on Smith on July 18, 2012, was not excessive, in that it was applied by Ely in a good-faith effort to control Smith's actions in kicking and being disruptive inside the prisoner transport van;

3. Smith was not injured by the use of the electric shock belt on him on July 18, 2012;

4. Ely did not assault or batter Smith on July 18, 2012;

5. Tate and Mathena were not deliberately indifferent to any serious medical need presented by Smith;

6. Smith has failed to present sufficient evidence to prove his medical negligence claims against Tate; and

7. Smith did not properly exhaust his administrative remedies before filing suit against the defendants.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court enter judgment on all claims in favor of the defendants.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written

objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen E. Conrad, Chief United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: November 3, 2015.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-27-